UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| KENNY WHITMORE (#86468) | * | CIVIL ACTION NO.: 4-0004-JJB-RLB |
| | * | |
| VERSUS | * | JUDGE JOHN W. DEGRAVELLES |
| | * | |
| N. BURL CAIN, WARDEN, ET AL. | * | MAGISTRATE JUDGE RICHARD L. |
| | * | BOURGEOIS, JR. |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## PLAINTIFF KENNY WHITMORE'S RULE 7(A) REPLY

Plaintiff Kenny Whitmore submits this Rule 7(a) Reply pursuant to the Court's January 8, 2015 Order. Rec. Doc. 55 at p. 2.

## I.    PRELIMINARY STATEMENTS

The Rule 7(a) reply, often referred to as a *Schultea* reply, "[b]y definition … must be tailored to the assertion of qualified immunity and fairly engage its allegations. A defendant has an incentive to plead his defense with some particularity because it has the practical effect of requiring particularity in the reply." *Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir. 1995)

Defendants, however, fall woefully short. They have asserted the defense of qualified immunity as follows:

> EIGHTH DEFENSE – QUALIFIED IMMUNITY:
> In the alternative, if the defendants are found by the Court to have violated the plaintiff's civil rights, then the defendants are immune from a judgment for damages because they acted at all times reasonably and in good faith and in accordance with federal and state law and institutional rules and regulations.

Rec. Doc. 20, p. 2.

The way Defendants articulate their qualified immunity defense makes it difficult, if not impossible, to engage the allegations with the specificity envisioned by *Schultea*.

First, there is absolutely no detail regarding any specific Defendant's claim to qualified immunity, only the same generic, "boiler plate" allegation for each. Second, even if each Defendant "acted at all times … in good faith" that does not mean they are entitled to qualified immunity. *Schultea*, 47 F.3d at 1431 (noting the Supreme Court "rejected the subjective, good faith element of the qualified immunity defense" in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)).

Moreover, "the facts of good faith and the facts underlying immunity depend on facts peculiarly within the knowledge and control of the defendant." *Id* A *Schultea* reply, however, must speak to the factual particulars of the alleged actions only "when those facts are known to the plaintiff and are not peculiarly within the knowledge of defendants." *Schultea*, 47 F.3d at 1432. When those facts are not known to the plaintiff—as is the case with the facts of good faith—it is impossible for a plaintiff to engage them in his reply.

Because the Defendants alone have the facts demonstrating their alleged good faith, under *Schultea* and *Harlow*, Mr. Whitmore cannot be expected to draft a Rule 7(a) reply that engages the particulars of such a subjective, "good faith" defense.

Third, Defendants assert that their purported compliance with federal and state law as well as institutional rules and regulations—though they do not point to a single law, rule, or regulation with which they are complying—shields them from individual liability. However, qualified immunity does not apply if the rules and regulations themselves violate an individual's

constitutional rights. Moreover, Plaintiff has specifically pleaded each Defendant's failure to abide by clearly established constitutional law. *See* Rec. Doc. 8.

Last, Defendants assert they are entitled to qualified immunity because they acted reasonably. The standard for claiming qualified immunity is whether a constitutional right is established enough that a <u>reasonable official</u> would understand that what he is doing violates that right. *Wilkerson v. Goodwin*, --- F.3d. ---, 2014 WL 7211168, *3 (5th Cir. 2014). As shown in further detail below, Mr. Whitmore clearly states that his rights were established such that a reasonable official would have known that:

1. Keeping him in solitary for his political beliefs violates his First Amendment rights;

2. Indefinite placement in the solitary confinement gives rise to a liberty interest and constitutionally sound due process regarding his classification;

3. Being deliberately indifferent to and keeping him in solitary for over 35 years violates his Eighth Amendment right to be free from cruel and unusual punishment;

4. Keeping him in solitary confinement as punishment for a non-violent escape attempt for over 29 years when white prisoners who escaped at the same time were not placed in solitary or were released years ago violates his Fourteenth Amendment right to equal protection.

The legal standards detailed below demonstrate that each of these rights was well established and it was therefore <u>unreasonable</u> for any of the Defendants to allow Mr. Whitmore to remain in solitary confinement.

Defendants have not asserted any additional facts or specifics regarding their qualified immunity defense. However, Mr. Whitmore will attempt to lay out in this reply the specific acts and omissions, detailed in his complaint, his discovery responses, and the documents produced by the Defendants, each Defendant took in violation of his constitutional rights. Mr. Whitmore specifically reserves his right to seek limited discovery on the issue of qualified immunity. Mr. Whitmore incorporates by reference his Complaint, Rec. Doc. 1, and First Amended Complaint, Rec. Doc. 8.

## II.    LEGAL STANDARDS

A plaintiff states facts overcoming a defendant's assertion of qualified immunity where he alleges, with factual specificity, (1) a violation of an established constitutional right and (2) that the right was clearly established at the time of the defendant's alleged misconduct. *Wilkerson*, 2014 WL 7211168 at *3. To be "clearly established" for the purposes of qualified immunity "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.*

Mr. Whitmore has alleged violation of his First, Eighth, and Fourteenth (both due process and equal protection) Amendment rights.

**A.     Clearly Established First Amendment Right**

To plead facts sufficient to overcome Defendants' claimed qualified immunity for violation of his First Amendment rights, Plaintiff must allege that his constitutional right to hold political beliefs and be free from punishment for those political beliefs was clearly established at the time of his confinement in solitary. *Wilkerson*, 2014 WL 7211168, *3. Plaintiff was placed in solitary confinement the day he arrived at LSP on March 21, 1978.

A prisoner's First Amendment right to hold political beliefs and participate in political expression has been clearly defined since the 1970s. "Neither militant political ideas nor past or threatened litigation on the part of the inmate will authorize prison discipline by way of segregation or otherwise." *Morgan v. LaVallee*, 526 F.2d 221, 225 (2d Cir. 1975) (citing *U.S. ex rel. Larkins v. Oswald*, 510 F.2d 583, 584 (2d Cir. 1975); *Sostre v. McGinnis*, 442 F.2d 178, 189 (2d. Cir. 1971) (en banc) *cert. denied sub nom. Oswald v. Sostre*, 405 U.S. 978 (1972).

It has likewise been established since the 1970s that possession of Black Panther Party materials, even where such material "contain[s] considerable revolutionary or militant rhetoric, …. cannot be made the subject of disciplinary proceedings" or be sufficient reason to place inmate in solitary confinement. *Larkins*, 510 F.2d at 587-588 (upholding jury award for wrongful placement in solitary, over 12 days, for "possession of 'revolutionary' papers" in inmate's cell).

To sanction the punishment of inmates for holding political beliefs, or even putting those beliefs on paper, "even though in the judgment of prison officials the writings were 'inflammatory' and 'racist,' … would permit prison authorities to manipulate and crush thoughts

under the guise of regulation." *Sostre*, 442 F.2d at 202. "Any real threat to prison security that [the inmate's] possession of his writings might have posed could have been met by confiscation rather than punishment." *Id*. at 203.

### B.    Clearly Established Fourteenth Amendment Due Process Right

To plead facts sufficient to overcome Defendants' claimed qualified immunity for violation of his Fourteenth Amendment due process rights, Plaintiff must allege that he had a liberty interest in his classification and that this interest gave rise to due process protections. *Wilkerson*, 2014 WL 7211168, *3. Plaintiff must further allege that the process provided was insufficient to meet these protections. *Id.*

A prisoner's Fourteenth Amendment right to due process protections from indefinite, arbitrary, or unfounded placement in solitary confinement is clearly established. *Wilkerson*, 2014 WL 7211168, *10. As early as 2005, the Supreme Court made clear that "'indefinite' placement in 'highly restrictive conditions' implicates a liberty interest, even if that placement is the result of an initial classification."[1] *Id.* (quoting *Wilkinson v. Austin*, 545 U.S. 209, 213, 222-24 (2005). Both the Fifth Circuit and the Supreme Court have "recognized that even if an initial security classification does not generally implicate a liberty interest, such an interest may arise where an initial classification is also attended by 'extraordinary circumstances,' that is, an 'atypical and significant hardship.'" *Id.* (quoting *Wilkinson*, 545 U.S. at 213). Moreover, "no reasonable prison official could conclude that continuing four decades in

---

[1]    Plaintiff alleges his classification as a closed-cell restriction ("CCR") inmate is punitive and not administrative.

indefinite solitary confinement would not implicate a liberty interest protected by due process." *Id.* at *11.

### C.    Clearly Established Eighth Amendment Right

To plead facts sufficient to overcome Defendants' claimed qualified immunity for violation of his Eighth Amendment rights, Plaintiff must allege that he has suffered an extreme deprivation by placement in solitary confinement and that the Defendants acted with deliberate indifference to this extreme deprivation. *Wilkerson*, 2014 WL 7211168, *3; *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

Since the 1970s it has been clearly established that the Eighth Amendment proscribes more than physically barbarous punishments and that "[c]onfinement in a prison or in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards." *Hutto v. Finney*, 437 U.S. 678, 685 (1975). While punitive isolation is not "necessarily unconstitutional, [] it may be, depending on the duration of the confinement and the conditions thereof." *Id.* (quotations omitted).

Although no court has specifically held what duration in solitary confinement constitutes cruel and unusual punishment, it has been clearly established that "[t]he length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards." *Id.* at 686. "[T]he longer the stay in solitary confinement, the greater the chance it violates the Eighth Amendment." *Rosario v. Williams*, Civ. No. 13-1945, 2013 WL 335114, *7 (E.D.Pa. Jan. 29, 2014) (citing *Hutto v. Finney*, 437 U.S. 678, 686 (1975)). It is clear that

indefinite and/or more than three decades confinement in solitary can violate the Eighth Amendment.

As well, the Fifth Circuit has held that the exact solitary confinement conditions in which Plaintiff Whitmore has been held for over 35 years constitute "extraordinary circumstances" that pose "atypical and significant hardship[s]." *Wilkerson*, 2014 WL 7211168, *10. "It is difficult, if not impossible, to imagine circumstances more extraordinary that nearly four decades in solitary confinement." *Id.* at *11.

**D.     Clearly Established Fourteenth Amendment Equal Protection Right**

To plead facts sufficient to overcome Defendants' claimed qualified immunity for violation of his Fourteenth Amendment equal protection rights, Plaintiff must allege that he was treated differently than similarly-situated individuals on the basis of his race and that racially discriminatory intent or purpose was behind the disparate treatment. *Wilkerson*, 2014 WL 7211168, *3.

It is well established that the equal protection clause of the Fourteenth Amendment prohibits states and public officials from intentionally discriminating against individuals on the basis of race. *Shaw v. Reno,* 509 U.S. 630, 642 (1993). "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.,* 535 U.S. 188, 194 (2003) (citation and internal quotes omitted). Where punishment in prison is inflicted on a discriminatory basis because of a person's race, such punishment violates the equal protection

clause of the Fourteenth Amendment. *Labat v. McKeithen*, 243 F. Supp. 662, 666 (E.D. La. 1965).

III.   **FACTUAL ALLEGATIONS**

   **A. Warden Burl Cain**

   Warden Cain has been the Warden at Louisiana State Penitentiary ("LSP" or "Angola") since 1995. Warden Cain has the authority to release Mr. Whitmore from solitary confinement into the general population, but has directed members of the Lockdown Review Board as well as Wardens Fontenot, Vannoy, Lamartiniere, and Peabody to keep Mr. Whitmore in solitary until Mr. Whitmore renounces his association with the Black Panther Party and its former members. Warden Cain has spoken to journalists about Mr. Whitmore and indicated that Whitmore's affiliation with the Black Panther Party is a concern for Cain because he believes that Mr. Whitmore will spread his beliefs if released into the general population. Cain also believes that the Black Panther Party advocates racism and violence. *See* http://www.medilljusticeproject.org/2014/07/19/louisiana-warden-considers-end-to-inmates-solitary-confinement-after-more-than-three-decades/. The Angola Chapter of the Black Panther Party, however, has been defunct since the late 90s.

   Warden Cain spoke with Mr. Whitmore personally sometime between 1998 and 1999. During this conversation Warden Cain acknowledged that he knew who Mr. Whitmore was, calling Mr. Whitmore an "outlaw." On information and belief, this comment was based on Warden Cain's association of Mr. Whitmore with members of the Angola Three, Albert Woodfox, Herman Wallace, and Robert King, as well as his association of Mr. Whitmore with

the Black Panther Party. Each member of the Angola Three has been exonerated and Mr. Whitmore was not an inmate at LSP when the crime for which they had been convicted occurred.

Mr. Whitmore filed an Administrative Remedy Procedure ("ARP") in July 2013, directing it to Warden Cain, requesting release from solitary and laying out his Eighth and Fourteenth Amendment claims and requesting proper review of his classification. Exhibit A. The ARP was rejected because "Lockdown Review Board decisions may not be challenged." Ex. A, p. 1.

Warden Cain is aware that Mr. Whitmore has been in solitary for over 35 years. Warden Cain has failed to release Mr. Whitmore from solitary or provide him with the proper review of his confinement. He acts with deliberate indifference by failing to release him.

Warden Cain is also aware that the Lockdown Review Board does not provide Mr. Whitmore with an actual review for possible release to a less restricted status, even though such a review is required every 90 days by the Louisiana Department of Corrections Disciplinary Rules and Procedures for Adult Offenders ("DOC Rules"). Mr. Whitmore is instead removed from his cell, placed in ankle and wrist shackles and walked to the end of the tier where he is handed a "Lockdown Review Summary" (e.g. Rec. Doc 8-1). The summary always keeps Mr. Whitmore in solitary and gives various reasons for his continued confinement. Sometimes the summary states he is in solitary because he is an "escape risk" or because he committed a "rule infraction," sometimes it states he is there because of the "nature of original reason for lockdown," and sometimes the summary is left blank or with no indication as to why he remains in solitary. The summary is always signed by one or more classification officers or Attorney

10

Registration and Disciplinary Commission ("ARDC") specialists, though their signatures are almost always illegible.  *See* Rec. Doc. 8-1.

On information and belief, if the Lockdown Review Board properly reviewed Mr. Whitmore's status and recommended he be released to the general population, Warden Cain would not approve the transfer. Indeed, Warden Cain told the media in July 2014 that he would monitor Mr. Whitmore's mail and phone calls and meet with Mr. Whitmore personally. Warden Cain has never spoken with Mr. Whitmore about why he is keeping Mr. Whitmore in solitary or what Mr. Whitmore must do to be reclassified into the general population.

Warden Cain is aware that over 29 years in solitary for a non-violent escape attempt is highly unusual and that such a punishment has not been given to any white inmates at LSP. For example, Alberto Sosa escaped with Mr. Whitmore in 1985. He was never placed in solitary confinement. Warden Cain acts with deliberate in difference by keeping Mr. Whitmore in solitary for over 29 years as punishment for a non-violent escape attempt.

**B.  Warden Cathy Fontenot**

Warden Fontenot has been the assistant warden at LSP for 19 years. At various times during Mr. Whitmore's confinement to solitary she has been in charge of classification and participated in Lockdown Review Board decisions keeping Mr. Whitmore in solitary confinement. *See* Exhibit B. In reviewing his classification, Warden Fontenot did not speak to Mr. Whitmore or provide any actual review of his classification. She failed to interview Mr. Whitmore, talk with the Wardens of Camps J or C about his behavior, review his disciplinary

11

record, or assess whether he is suitable for the general population. She instead relied on Warden

Cain's instruction that Mr. Whitmore remain in solitary until he renounces his political beliefs.

Warden Fontenot knows that the Lockdown Review Board does not provide Mr.

Whitmore with a hearing or a substantive review of his classification. She validates and

participates in the sham proceedings described above and implements Warden Cain's instruction

that Mr. Whitmore will remain in solitary until he renounces his political beliefs and/or

association with members of the Black Panther Party. On information and belief if a

classification officer was to recommend to Warden Fontenot that Mr. Whitmore be released from

solitary, she would deny the request.

Warden Fontenot knows that Mr. Whitmore has been in solitary confinement for

over 35 years. She has rejected Mr. Whitmore's request for a group visit with his nephew, also

an inmate at LSP, because of this classification. She acts with deliberate indifference in failing to

release Mr. Whitmore from solitary or provide him with a constitutionally sound review of his

classification.

In reviewing Mr. Whitmore's Lockdown Review Board summaries, Warden

Fontenot was made aware that one purported reason for keeping Mr. Whitmore in solitary was as

punishment for a rule infraction in 1986, his non-violent escape. Warden Fontenot knows that no

other inmate has been punished in such a manner, but has failed to re-classify Mr. Whitmore as a

general population inmate or provide him with proper review of his classification.

### C. Warden Darrell Vannoy

Warden Darrell Vannoy is Deputy Warden and LSP. At various times during Mr. Whitmore's 35 years in solitary confinement, Warden Vannoy has overseen security and classifications and participated in Lockdown Review Board decisions keeping Mr. Whitmore in solitary. *See* Exhibit C.

In reviewing his classification, Warden Vannoy did not speak to Mr. Whitmore or provide any actual review of his classification. He failed to interview him, talk with the Wardens of Camps J or C about his behavior, review his disciplinary record, or assess whether he is suitable for the general population. Warden Vannoy instead relied on Warden Cain's instruction that Mr. Whitmore remain in solitary until he renounces his political beliefs.

Sometime in 2011, Warden Vannoy told Mr. Whitmore that Warden Cain wanted Whitmore to stop communicating with Albert Woodfox, Robert King, and Herman Wallace and that if Mr. Whitmore quit communicating with them, Warden Vannoy might be able to help him get out of solitary. Albert Woodfox, Robert King, and Herman Wallace were all members of the Black Panther Party and former inmates at Angola.

Similarly, in 2012, Warden Vannoy approached Mr. Whitmore and asked if he was still in contact with Nyati Bolt and Robert King. Vannoy told Mr. Whitmore that he did not like Robert King and that if Mr. Whitmore was let out of solitary confinement and Vannoy saw King or Bolt listed as visitors or in the visiting tier, that Vannoy would be disappointed. Nyati Bolt is a former member of the Black Panther Party and former inmate at Angola. Mr. Whitmore did not agree to Warden Vannoy's requests and Warden Vannoy kept Mr. Whitmore in solitary.

13

Warden Vannoy knows that the Lockdown Review Board does not provide Mr. Whitmore with a hearing or a substantive review of his classification. He validates and participates in the sham proceedings described above and implements Warden Cain's instruction that Mr. Whitmore will remain in solitary until he renounces his political beliefs and/or association with members of the Black Panther Party. On information and belief if a classification officer was to recommend to Warden Vannoy that Mr. Whitmore be released from solitary, he would deny the request.

Warden Vannoy knows that Mr. Whitmore has been in solitary for over 35 years. He acts with deliberate indifference by failing to release Mr. Whitmore from solitary, refusing to give Mr. Whitmore a constitutionally sound review, and keeping him there on the basis of his political beliefs and association with members of the Black Panther Party.

In reviewing Mr. Whitmore's Lockdown Review Board summaries, Warden Vannoy was made aware that one purported reason for keeping Mr. Whitmore in solitary was as punishment for a rule infraction in 1986, his non-violent escape. Warden Vannoy knows that no other inmate has been punished in such a manner, but has failed to re-classify Mr. Whitmore as a general population inmate or provide him with proper review of his classification.

**D.  Warden Richard Peabody**

Warden Richard Peabody is a deputy warden at Angola and has worked at the prison for 37 years. At various times during Mr. Whitmore's 35 years in solitary, Warden Peabody has been in charge of security and classification and influenced and participated in Lockdown Review Board decisions keeping Mr. Whitmore in solitary. In reviewing his

14

classification, Warden Peabody did not speak to Mr. Whitmore or provide any actual review of his classification. He failed to interview Mr. Whitmore, talk with the Wardens of Camps J or C about his behavior, review his disciplinary record, or assess whether he is suitable for the general population. Warden Peabody, having worked closely with Warden Cain since Cain started at LSP, instead relied on Warden Cain's command that Mr. Whitmore remain in solitary until he renounces his political beliefs.

Sometime between 2009 and 2012, Mr. Whitmore had a conversation with Warden Peabody about the conditions and restrictions on the solitary tier. Mr. Whitmore requested more contact visits for the inmates in solitary; Warden Peabody said they could not have them. Mr. Whitmore then requested to be released from solitary and reclassified into the general population. Warden Peabody responded that solitary was where Mr. Whitmore belonged.

Warden Peabody knows that the Lockdown Review Board does not provide Mr. Whitmore with a hearing or a substantive review of his classification. He validates and participates in the sham proceedings described above and implements Warden Cain's stated position that Mr. Whitmore will remain in solitary until he renounces his political beliefs and/or association with members of the Black Panther Party. On information and belief if a classification officer was to recommend to Warden Peabody that Mr. Whitmore be released from solitary, he would deny the request.

Warden Peabody knows that Mr. Whitmore has been in solitary for over 35 years, since the day Whitmore arrived at LSP. Warden Peabody acts with deliberate indifference by failing to release Mr. Whitmore from solitary, refusing to give him a constitutionally sound

review of his classification, and keeping him there on the basis of his political beliefs and association with members of the Black Panther Party.

In reviewing Mr. Whitmore's Lockdown Review Board summaries, Warden Peabody was made aware that one purported reason for keeping Mr. Whitmore in solitary was as punishment for a rule infraction in 1986, his non-violent escape. Warden Peabody knows that no other inmate has been punished in such a manner, but has failed to re-classify Mr. Whitmore as a general population inmate or provide him with proper review of his classification.

### E.  Warden Joe Lamartiniere

Warden Joe Lamartiniere is an assistant warden at Angola. At various times during Mr. Whitmore's 35 years in solitary, Warden Lamartiniere has been in charge of the outcamps at LSP, including Camp-C where Mr. Whitmore is currently housed and Camp-J where he has been housed before, and has influenced and participated in decisions keeping Mr. Whitmore in solitary. In participating in decisions to keep Mr. Whitmore in solitary, Warden Lamartiniere did not speak with Mr. Whitmore or provide any actual review of his classification. He failed to interview Mr. Whitmore, talk with the Wardens of Camps J or C about his behavior, review his disciplinary record, or assess whether he is suitable for the general population. Warden Lamartiniere instead relied on Warden Cain's instruction that Mr. Whitmore remain in solitary until he renounces his political beliefs.

Warden Lamartiniere knows that the Lockdown Review Board does not provide Mr. Whitmore with a hearing or a substantive review of his classification. He validates and participates in the sham proceedings described above and implements Warden Cain's stated

position that Mr. Whitmore will remain in solitary until he renounces his political beliefs and/or association with members of the Black Panther Party. On information and belief if a classification officer was to recommend to Warden Lamartiniere that Mr. Whitmore be released from solitary, he would deny the request.

In 2011 Mr. Whitmore wrote to Warden Lamartiniere about his continued confinement in solitary. Both in 2011 and 2012, Warden Lamartiniere visited Mr. Whitmore and said that he knew how long Mr. Whitmore had been in solitary and that he wanted to get Mr. Whitmore out and into the general population. In 2012, Lamartiniere told Mr. Whitmore to write to Warden Vannoy about the matter and that he would talk to Warden Vannoy for him. Mr. Whitmore wrote the letter to Warden Vannoy, but never heard from Warden Vannoy or Warden Lamartiniere further about the issue.

Warden Lamartiniere knows that Mr. Whitmore has been in solitary for over 35 years. Warden Lamartiniere acts with deliberate indifference by failing to release Mr. Whitmore from solitary, refusing to give him a constitutionally sound review of his classification, and keeping him there on the basis of his political beliefs and association with members of the Black Panther Party.

Warden Lamartiniere knows that one purported reason for keeping Mr. Whitmore in solitary is as punishment for a rule infraction in 1986, his non-violent escape. Warden Lamartiniere knows that no other inmate has been punished in such a manner, but has failed to re-classify Mr. Whitmore as a general population inmate or provide him with proper review of his classification.

### F.  Secretary James LeBlanc

James LeBlanc is the current Secretary of the Department of Corrections. He was appointed to the position after Richard Stalder left the office in 2008. Secretary LeBlanc oversees the operations of the prisons in Louisiana, including LSP. During his career in corrections, Secretary LeBlanc has worked closely with Warden Cain.

When Secretary LeBlanc began his tenure as Secretary, he rescinded the Disciplinary Rules and Procedures for Adult Offenders ("DOC Rules") that had been in place and adopted a new set of rules. Secretary LeBlanc's DOC Rules allow for disciplinary detention/extended lockdown, which is described as "[a]n indeterminate period of detention characterized by routine 90-day classification reviews to determine eligibility/suitability for release from this status." If an inmate assigned to indefinite, extended lockdown was initially classified as maximum custody (i.e., as a solitary inmate), the policy states that a Disciplinary Hearing is not necessary to keep the inmate housed indefinitely and that "[a] Classification Board hearing is sufficient." As well, the policy does not allow for review or appeal of the decisions of the Lockdown Review Board, the ARP or any other process.

Mr. Whitmore was initially classified as an extended lockdown inmate. The sparse form indicates this was because of the length of his sentence. Exhibit D. The policy created and adopted by Secretary LeBlanc allows for Mr. Whitmore's indefinite, unconstitutional detention in solitary confinement, without appeal or review.

Secretary LeBlanc is involved with decisions regarding inmates in LSP's CCR tier, where Mr. Whitmore is located. Secretary LeBlanc considered closing the CCR unit at LSP

in 2010, when CCR inmates were housed near the gates. At the time the DOC was considering closing the tier, Secretary LeBlanc reported to The Advocate that he intended to keep the inmates in isolation even if the tier closed.

Secretary LeBlanc is aware that Mr. Whitmore has been in solitary confinement for 35 years. During this time he has failed to ensure Mr. Whitmore received a constitutionally sound review of his classification. He acts with deliberate indifference toward Mr. Whitmore's indefinite confinement to solitary and has failed to have him reclassified into the general population. Secretary LeBlanc has agreed with and supported Warden Cain's decision to keep Mr. Whitmore in solitary until he renounces his political beliefs.

### G. Secretary Richard Stalder

Richard Stalder was the Secretary of the Department of Corrections from 1992 until 2008. During that time he oversaw Louisiana's prisons, including LSP. Before that, Secretary Stalder had been a deputy warden under Burl Cain. He has worked closely with Warden Cain during his career.

Secretary Stalder also adopted and implemented policies that allowed for indefinite detention of inmates in solitary confinement. Secretary Stalder's DOC policies also stated that decisions of the Lockdown Review Board were not appealable through the ARP or any other process and that an inmate initially classified as a CCR inmate was not entitled to a hearing from the Disciplinary Board.

Mr. Whitmore was initially classified as an extended lockdown inmate. The form indicates this was because of the length of his sentence. Exhibit D. The policy adopted and

implemented by Secretary Stalder allows for Mr. Whitmore's indefinite, unconstitutional detention in solitary confinement.

Secretary Stalder was aware that Mr. Whitmore had been in solitary confinement for over 28 years. During his time as Secretary he failed to ensure Mr. Whitmore received a constitutionally sound review of his classification. He acted with deliberate indifference toward Mr. Whitmore's indefinite confinement to solitary and failed to have him reclassified into the general population. Secretary Stalder agreed with and supported Warden Cain's decision to keep Mr. Whitmore in solitary until he renounced his political beliefs.

## IV.    CONCLUSION

Plaintiff Kenneth Whitmore has spent over 35 years in solitary confinement. He is not there because he is a security or escape risk. He has never advocated for violence nor does he have a violent disciplinary record. Mr. Whitmore remains confined to a cell with no more than 3' x 5' of space to move around in for 23 hours a day because he refuses to renounce his political beliefs. Each individual named in this suit has directly participated in keeping Mr. Whitmore in solitary confinement without valid reason and without access to anything resembling due process.

Respectfully submitted,

*/s/Michelle M. Rutherford*
Michelle M. Rutherford, Bar No. 34968, TA
Richard E. Sarver, Bar No. 23558
David N. Luder, Bar No. 33595
Erica A. Therio, Bar No. 34115
BARRASSO USDIN KUPPERMAN
 FREEMAN & SARVER, L.L.C.
909 Poydras Street, Suite 2400
New Orleans, Louisiana 70112

Telephone:      (504) 589-9700
Facsimile:      (504) 589-9701
Email: mrutherford@barrassousdin.com
          rsarver@barrassousdin.com
          dluder@barrassousdin.com
          etherio@barrassousdin.com

Rose Murray, Bar No. 34690
JONES, SWANSON, HUDDELL & GARRISON,
L.L.C.
601 Poydras Street, Suite 2655
New Orleans, LA 70130
Telephone:      (504) 523-2500
Telecopier:      (504) 523-2508
Email: rmurray@jonesswanson.com

*Counsel for Kenny Whitmore (#86468)*

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of January 2015, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel registered for electronic service.

*/s/Michelle M. Rutherford*

{1031051_1}